AMERICAN INDEMNITY CO. v. WEB-
STER PARISH SCHOOL
BOARD et al.

Civ. A. No. 3166.

United States District Court
W. D. Louisiana, Shreveport Division.

July 2, 1951.

Irion & Switzer, Shreveport, La., for plaintiff.

James E. Bolin, Dist. Atty. for Twenty-Sixth Judicial Dist., Springhill, La., for Webster.

Hargrove, Guyton, Van Hook & Hargrove, Shreveport, La., for Collins.

Campbell & Padgett, Bossier City, La., for the bank.

DAWKINS, Chief Judge.

The plaintiff, a Texas corporation (called Indemnity), sued Webster Parish School Board (called Webster), Howard Collins (called Contractor) and Bossier Bank & Trust Company (called Bank), all citizens of Louisiana, alleging in substance as follows: That Webster and the contractor had on September 12, 1949, entered into a written building contract for the total sum of $100,771.43, for the erection of a gymnasium to be used in connection with the public school at Doyline, Louisiana, and in which it was agreed that Webster should at all times withhold payments of 10% on all moneys coming due to the contractor, until the contract was completed, and all laborers and furnishers of material had been paid. Further, that complainant, as surety, had executed with the contractor in favor of Webster a bond to protect it against claims by laborers and material-men, for the full sum of the contract price, all in accordance with Act 224 of the State Legislature of 1918, as amended by Act 271 of 1926, which contract and bond had been duly recorded in the records of Webster Parish; that the contract had been completed and accepted by Webster, but that there remained due and owing to materialmen the total sum of $13,611.43, for which complainant, as surety, was liable, although no liens had been filed within the 45 days allowed by the said state law; that Webster, in compliance with the contract and bond had retained in its possession the balance due of 10%, amounting to $11,170.42, and refused to apply the same either to the payment of said claims or to turn it over to complainant for said purpose, except upon the written request of contractor, which the latter declined to make, notwithstanding frequent demands by plaintiff therefor. Further, that the contractor had informed complainant on November 7; 1950, that the supervising architects had furnished to said contractor a "final certificate" (meaning no doubt of the acceptable completion of the work), which had been delivered to the Bank "in connection with a loan by said Bank to said Collins of the sum of Eleven Thousand ($11,000.00) Dollars"; that if such information was "correct, complainant will have to pay to sub-contractors and furnishers of material * * * amounts in excess of the sum of Eleven Thousand One Hundred Seventy and 42/100 ($11,170.42) Dollars";. further, "under the express provisions" of the said contract executed by the con-

tractor and the bond of complainant, the latter was subrogated to the rights of all persons against the contractor and Webster, which it pleads "in the alternative" as entitling it to said sum; that the Bank claimed said sum, and complainant has been compelled to take legal action in an effort to force delivery of said money as to which the School Board had no legal claim.

Complainant prayed judgment against all defendants, decreeing it "entitled to said sum * * * by privilege, preference and priority" and that Webster be ordered and directed to pay said sum "unto complainant, and upon its failure to do so, within a time to be fixed by this Court," after which plaintiff have judgment against Webster for the amount thereof with legal interest of 5% from judicial demand.

Webster has paid into the registry of the court the sum admittedly due, and the parties conceded that it should be discharged from further responsibility.

Defendant Bank answered on February 19, 1951, denying, for lack of information, the main allegations of the complaint as to the relations between complainant and the contractor, and averring that on October 18, 1949, some 36 days after the execution of the original contract and bond between Webster, the contractor and complainant, it "had agreed to furnish interim financing for" the contractor under said building contract, and that the latter by letter bearing that date had promised "to forward all progress payments" to said Bank. Further, in effect, that it had carried out this agreement as to progress financing, which enabled the contractor to successfully prosecute the work under said contract; and that the contractor accordingly sent it, the Bank, all progress payments by Webster. The Bank further averred as follows:

"38.

"That on November 9, 1950, the said Howard Collins applied to respondent for a loan of Eleven Thousand ($11,000.00) Dollars, and in order to secure prompt repayment of said sum, offered to assign to your respondent a certain check due him by the Webster Parish School Board repre-senting the entire balance due him under his said contract.

"39.

"That in connection with the proposed loan referred to in the preceding paragraph and as an inducement to your respondent to make same, Howard Collins presented to your respondent a copy of the architect's final certificate, certifying that he, Collins, was entitled to the sum of Eleven Thousand One Hundred Seventy and 42/100 ($11,170.42) Dollars, as will be more fully shown by reference to said certificate which is annexed hereto and made part hereof.

"40.

"That in reliance upon the final certificate of the supervising architects and upon previous successful experience with Collins under his said contract with the Webster Parish School Board, your respondent, on November 9, 1940, loaned to Howard Collins the sum of Eleven Thousand ($11,000.-00) Dollars, receiving from him in consideration therefor, and in order to secure prompt payment thereof, his assignment and pledge of delivery of a check to him by the Webster Parish School Board, representing the retained portion under his said contract, which said act of assignment and pledge, dated November 9, 1950, is attached hereto and made part hereof.

"41.

"Further answering, respondent shows that it is informed, believes and therefore avers that the entire Eleven Thousand ($11,000.00) Dollars loaned by it to Howard Collins was used by him to pay laborers and materialmen for services performed and material furnished in the construction of improvements under his said contract with the Webster Parish School Board.

"42.

"That, under the circumstances, having supplied the funds necessary for Collins to complete the work, and the same having been paid over by Collins to laborers and materialmen, as will be more fully shown upon trial of this cause, your respondent stands in the same position as would a

supplier of materials and should receive the entire amount of its claim by preference and priority over all other persons and claims whatsoever, particularly by preference and priority over the claim of plaintiff herein."

It also alleged that without this interim financing the contractor would "have been unable to complete the work," and "plaintiff, as surety upon his bond, would have been required to complete said work, thus risking even greater loss"; and finally, that all of the said $11,000 loaned by said Bank to the contractor was "used in the payment of laborers and materialmen" and repeating that complainant's liability would have been greater under its suretyship on the bond. The Bank prayed that it be awarded all sums paid into the court by Webster by preference.

Defendant contractor answered, admitting certain allegations of the complaint, but denying others. Among those admitted was the fact that he "has not paid the subcontractors and furnishers of material used in the construction of the aforesaid gymnasium" and averred that he "lost money on the job" and had been "unable up to this time to pay certain subcontractors," etc.; that complainant had called upon him, the contractor, "to consent to the payment by Webster" to complainant of the said sum of $11,170.42 retained under the contract, and that he "refused to give his consent" thereto; that he had obtained from the supervising architects a "final certificate" and had delivered same to the Bank in connection with a loan by the Bank to him of $11,000. Further answering, the contractor made substantially the same allegations with regard to interim financing as were made by the Bank, and alleged that on November 9, 1950, he had applied to the Bank for a loan of $11,000 for the express purpose of using the funds received therefrom to pay laborers and materialmen, and to secure the same, offered to assign to said Bank the entire unpaid balance due defendant under the aforesaid contract with Webster.

Defendant contractor further admitted that he obtained copy of the final certificate showing a balance due of $11,170.42 and turned it over to the Bank, as disclosed in Article 40 of his answer, as follows: "That on November 9, 1940, Bossier Bank & Trust Company loaned defendant the sum of $11,000, receiving from defendant in consideration therefor, and in order to secure the prompt payment thereof, defendant's assignment and pledge of delivery of a check to him by the Webster Parish School Board representing the retained portion under his said contract, which said act of assignment and pledge dated November 9, 1950, was attached to and made a part of the answer of Bossier Bank & Trust Company filed in this cause."

Further, that the entire loan of $11,000 was used to pay certain subcontractors and materialmen. Finally, he alleged as follows:

"43.

"That defendant, without solicitation or any notice from complainant, went to complainant's attorneys on or prior to November 21, 1950, and informed them that certain moneys were owed by him to subcontractors and suppliers of material on the Doyline gymnasium job and that he was unable to pay the same;

"That at that time defendant asked complainant, through complainant's attorneys, to lend him a sufficient amount to pay said subcontractors and suppliers of material on the Doyline gymnasium job; that complainant's attorneys informed defendant that they would take up with complainant the question of making said loan;

"That thereafter, on November 27, 1950, complainant's attorneys prepared a note for execution by defendant in the sum of $13,611.43, bearing 5% interest from date until paid, payable to the order of complainant and being due on or before six months after date, which said note was secured by a chattel mortgage, also prepared by complainant's attorneys; that defendant executed the aforesaid note and chattel mortgage and delivered the same to complainant's attorneys, who filed said chattel mortgage for record in Caddo Parish, Louisiana; that said chattel mortgage was recorded in Book 193, Page 451 of the Chattel Mortgage Records of Caddo Par-

ish, Louisiana, and defendant annexes hereto and makes a part hereof a certified copy of said chattel mortgage;

"That complainant has never returned or offered to return to defendant the aforesaid note and has never cancelled or offered to cancel the inscription of the aforesaid chattel mortgage from the Records of Caddo Parish, Louisiana;

"That after defendant had executed and delivered the aforesaid note and chattel mortgage to complainant through complainant's attorneys, and after complainant, through its attorneys, had accepted the same, defendant was requested to consent to the payment by the Webster Parish School Board to the complainant of the sum of $11,170.42, and that defendant refused to give his consent to said proposal for the reason that said payment had already been assigned by him to Bossier Bank & Trust Company;

"That the facts and circumstances detailed hereinabove constitute a novation of any debt of defendant to complainant arising out of the aforesaid application for bond and the aforesaid surety contract, and moreover, estop complainant from claiming any part of the funds on deposit in this proceeding, defendant hereby especially pleading novation and estoppel against complainant's claims."

Complainant has filed under Rule 12(f) of the Federal Rules of Civil Procedure, 28 U.S.C.A., motions to strike portions of the answers both of the Bank and the contractor, and these are the matters to be considered.

In the motion to strike allegations from the answer of the Bank, plaintiff includes Articles 35–44, both inclusive, containing details of the transactions between it and the contractor, by which funds for the interim financing were obtained and paid, as well as the final loan of $11,000, the reason being, in effect, that the loans were all made after the execution and recordation of the original contract and bond.

▆▆▆ Rule 12(f) does permit the striking from a pleading of "any insufficient defense" but whether this shall be done depends upon the circumstances in each case, after considering all the pleadings together. Ordinarily, the rights of the owner, contractor and surety become fixed upon the execution of a building contract and surety bond (according to statutory requirements), and nothing that any of the parties may do without the concurrence of the other can bind the one not agreeing thereto. Claiborne Parish School Board v. Fidelity & Deposit Co. of Maryland, 5 Cir., 1930, 40 F.2d 577. It was none of the surety's business or concern as to how the contractor intended to finance the performance of his contract. Its obligations were to the owner, unpaid laborers, materialmen, subcontractors, etc., and remained to the end, as did its rights to have the contract price paid by Webster according to the terms of this original agreement. If the court should order these allegations of the Bank and the contractor stricken, there would be little or no defense left or basis for their claims to these funds. At the same time, no reason can be seen why a contractor may not borrow money from a third party to finance his operations and apply the earned estimates above the retained percentages, in good faith, to the satisfaction of such loans for the money so borrowed, and actually used in paying the laborers, materialmen and subcontractors. If the contractor underestimates what it costs to perform his contractual obligations, those for whose protection the bond was executed may hold the bondsman for any excess. This is a chance which the surety takes. Nor does the owner (Webster) have to concern himself, in the ordinary circumstances, about what the contractor does with the earned payments other than the retained percentage. For these reasons, the retained percentage cannot be diverted by the owner or anyone else to the prejudice of the surety on the bond. The recorded contract and bond constitute notice to anyone dealing with the contractor that the latter cannot receive this balance until he has performed his obligations both in completing the work and paying all those who have any claims arising from its performance. Claiborne Parish School Board v. Fidelity & Deposit Co. of Maryland, supra. This retained per-

centage is also for the protection of the owner, and to this extent he is protected against the bankruptcy of both the contractor and his surety. Of course, after acceptance by the owner and the expiration of the statutory delays for filing liens, as stated, earlier, he may be discharged from the controversy by paying the balance into the registry of the court for the benefit of whoever is found entitled to receive it. However, if, as sometimes happens, the contractor defaults, and the surety declines to undertake completion of the work, the owner, to avoid greater loss or damage, may take over and complete the contract. In that event, his rights against both the contractor and the surety are preserved, including the application of the retained percentage to that purpose.

█ Complainant also moves to strike Articles 15 and 35 to 44, both inclusive, of the contractor's answer on substantially the same grounds as those urged with respect to the Bank. The matter sought to be stricken from Article 15 is that the contractor "lost money on the job" and has been unable to pay amounts due to subcontractors and materialmen. This, of course, is no concern to complainant or the owner, constitutes no defense, and should be stricken.

█ The defenses pleaded in Articles 35 to 44, both by the Bank and the contractor, for the same reasons, would constitute no defense standing alone. However, the contractor pleads novation and estoppel in Article 43, quoted above.

The parties, plaintiff and defendants, have filed stipulations, as follows:

"1.

"That Articles 1, 4, 5, 14, 15, 30 and 34 of the complaint are admitted.

"2.

"That the contract attached to the complaint as Exhibit 'A' is a duplicate original of the contract under which the Doyline Gymnasium was constructed.

"3.

"That the contract attached to the complaint as Exhibit 'B' is the original application made by Howard Collins to complainant for the bond, marked Exhibit 'C'.

"4.

"That the bond attached to the complaint as Exhibit 'C' is a duplicate original of the bond executed by the American Indemnity Company.

"5.

"That the Bossier Bank & Trust Company adopts, on information and belief, Article 17 of the answer filed by Howard Collins, and all parties hereto admit that on November 21, 1950, Howard Collins informed complainant that he owed a total of Thirteen Thousand Six Hundred Eleven and 43/100 ($13,611.43) Dollars to the concerns listed in Article 17 of the complaint."

It is argued on behalf of complainant that the execution of the note and chattel mortgage was merely to give it additional protection against its liability under the bond, while the contractor insists that it was to replace the rights and obligations theretofore existing. If there was a novation, then the claims of the Bank against the retained balance might become paramount to that of complainant, but if the mortgage and note were simply to give additional security, the result would be otherwise. Hence, the allegations of the answers of both remaining defendants may or may not become important depending upon the facts developed at the trial. While the motion to strike these allegations of novation and estoppel would ordinarily be good, the situation presented by the pleadings and exhibits is such that this court cannot determine therefrom that the issues are conclusively settled one way or the other. In the application for the bond, Collins obligated himself to give the surety additional security if required, but where one party alleges that the note and chattel mortgage were executed to replace the respective obligations under the original contract, there being no mention in

the mortgage of the purpose for which it was given, the court would not be justified in disposing of the case on the merits in this state of the record.

The motions to strike will be denied at this time. Complainant's rights can be protected by proper motion when the trial is completed.